UNITED STATES of America

v.

**Alfredo GALLEGO, George Gallego, and Steven Martinez, Defendants.**

**No. S1 95 Cr. 284(LAK).**

United States District Court,
S.D. New York.

Nov. 6, 1996.

Addendum Nov. 12, 1996.

Peter K. Vigeland, Special Assistant United States Attorney, Robin E. Abrams, Assistant United States Attorney, Mary Jo White, United States Attorney, for U.S.

Frederick H. Cohn, for Defendant Steven Martinez.

**OPINION**

KAPLAN, District Judge.

On January 21, 1993, Guillermo Gonzalez, the driver of a postal truck, was stopped on his rounds and shot to death in the Bronx. The truck, with Gonzalez' dead body inside, was driven to Fort Lee, New Jersey, and hurriedly abandoned.

The government first indicted Alfredo Gallego, who was apprehended near the truck, and Giovanni Rosado for robbery and conspiracy to rob and on other charges. Alfredo Gallego pleaded guilty to all charges. Rosado stood trial, but the jury was unable to reach a verdict.

Rosado then agreed to cooperate with the government. The grand jury later indicted Steven Martinez and George Gallego for murder, conspiracy to murder, robbery and conspiracy to rob. It charged Alfredo Gallego with murder and conspiracy to murder.[1] After George Gallego pleaded guilty to conspiracy to murder, Alfredo Gallego and Martinez went to trial and were convicted on all counts.[2]

Martinez now moves, pursuant to FED. R.CRIM.P. 33, for a new trial on the ground that he did not have the effective assistance of counsel. He makes essentially two claims.

---

1. The government recognized that Gallego's previous plea barred, on double jeopardy grounds, any robbery or conspiracy to rob charge.

2. The felony murder branch of the murder charge against Alfredo Gallego was dismissed prior to trial on double jeopardy grounds. *United States v. Gallego,* 907 F.Supp. 735 (S.D.N.Y. 1995).

He first contends that his determination to testify in his own defense was overborne by threats, conveyed by his counsel, that the government would prosecute members of Martinez' family if he took the stand. Second, he argues that his counsel did not adequately follow up leads prior to and during the trial and failed to call witnesses who would have helped his defense.

The Court has received extensive affidavits and conducted an evidentiary hearing at which Martinez, his trial counsel, and other witnesses testified over a period of two days. This opinion contains the Court's findings of fact and conclusions of law.

*Facts*

*Pretrial Proceedings*

Martinez was arrested in Atlanta, Georgia, on April 13, 1995 and then transferred to and presented in the Southern District of New York. On May 2, 1995, Stewart L. Orden, Esq., was appointed to represent him.

Orden adopted extensive pretrial motions filed on behalf of George Gallego, who had moved for production of a panoply of materials pursuant to Rule 16 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, as well as suppression of items seized pursuant to a search warrant and at the time of George Gallego's arrest. Orden moved also to suppress statements made by Martinez on September 21, 1993 [3] in which he acknowledged that he knew Giovanni Rosado and Pamela and George Gallego and that he drank Heineken beer, but claimed that his only knowledge of a robbery of a Postal Service truck driver came from what he had read in the newspapers or seen on television.[4]

Orden joined as well in subsequent *in limine* motions, filed on October 30, 1995 on behalf of George Gallego, which sought to compel the government to disclose the identity and location of a confidential informant and to obtain copies of grand jury transcripts. Further motions were filed on November 10, 1995, seeking leave to introduce at trial against the government certain party and adoptive admissions, to preclude the government from admitting certain postal reports filed by Guillermo Gonzalez a few weeks before his murder, and to preclude evidence related to a prior gun transaction involving Rosado, Martinez and George Gallego.[5]

In written correspondence and during a conference on December 18, 1995, Martinez expressed dissatisfaction with Orden, claiming that Orden had failed to provide him with various documents, including statements of witnesses from the Rosado trial, and to follow leads identified by Martinez.[6] The Court relieved Orden, and Andrew Patel, Esq was appointed to replace him. On the same day, George Gallego pleaded guilty to conspiracy to murder. In his plea allocution, George Gallego admitted under oath that he and others conspired to kill Gonzalez. (Tr. 698–702; GX 3474–K).

Before the trial, Patel filed additional *in limine* motions on Martinez' behalf in which he urged the Court to preclude evidence that Martinez had suborned perjury. He argued that such efforts, if they occurred, were part of a post-conspiracy scheme to conceal the completed crimes and hence inadmissible. Patel moved also for a severance of Martinez' trial from that of his remaining co-defendant, Alfredo Gallego, on the grounds that there was a substantial disparity in proof and that Alfredo Gallego intended to adopt much of the government's proof relating to the robbery. (Abrams Aff.Ex.D).

*The Trial*

Trial commenced on January 23, 1996 and ended on February 8, 1996. The jury returned a verdict of guilty on all counts as to

---

**3.** A copy of the memorandum containing Martinez' pretrial statements is Exhibit T to the Abrams affidavit.

**4.** A copy of Orden's motion, dated May 24, 1995, which includes Martinez' affidavit, is attached as Exhibit A to the Abrams affidavit.

**5.** The Court's resolution of many of these matters is reported in *United States v. Gallego*, 913 F.Supp. 209 (S.D.N.Y.1996).

**6.** Copies of the written submission by Martinez, dated February 14, 1996, and the transcript of the pretrial conference are attached to the Abrams affidavit as Exhibits B and C, respectively.

both defendants. The proof at trial amply established that Martinez and his co-defendant, along with George Gallego and Giovanni Rosado, conspired to rob and kill Gonzalez and participated in the robbery and Gonzalez' murder. Indeed, in the motion asserting ineffective assistant of counsel, present counsel for Martinez himself characterized the government's proof of Martinez' guilt as "overwhelming." (Def.Mem. 5)

*The Government's Case as to Martinez*

The principal witness against Martinez was Giovanni Rosado, who testified pursuant to a cooperation agreement. As an accomplice, he provided first-hand, detailed testimony about the participation of Martinez and the Gallegos in the murder and robbery. Rosado testified that Martinez told Rosado about his robbery plans (Tr. 406–08), that Martinez began to recruit Rosado in or about December 1992 (Tr. 408–10), and that Martinez, George Gallego, and Alfredo Gallego attempted to rob the postal driver on January 14, 1993, a week before the actual robbery and murder (Tr. 429–38). He then described how the robbery and murder occurred on January 21, 1993. (Tr. 446–77)

Four other witnesses testified to incriminating statements by Martinez. Two, Solvieg Rivera McAuley and Peter Harney, met Martinez in 1992 at a bar frequented by Martinez where Harney worked as a bartender. Both testified without immunity. (Tr. 196–213; Tr. 107–35)

McAuley testified that she overhead Martinez talking to others in the bar on two separate occasions in the fall of 1992 about possibly robbing a Post Office. (Tr. 124–27) Harney testified that Martinez asked Harney in the fall of 1992 if he were interested in making a lot of money. (Tr. 203) After Harney expressed interest, Martinez, on a day which Harney "guess[ed] ... was in November ... or early December," drove Harney and two others in Martinez' car to scout out the Parkchester Post Office, the location of the subsequent homicide and robbery. (Tr. 205–10) In the "following week," Martinez told Harney that he was planning to knock

off a payroll truck from the Post Office, and Harney refused to participate. (Tr. 210–12) Harney revealed Martinez' plan to mutual friends. "A week or so later," Martinez visited the bar and told Harney to keep his mouth shut. (Tr. 212–13)

The third witness, Arthur Brown, testified pursuant to an order of immunity.[7] Brown testified that Martinez took Brown to George Gallego's apartment in late 1992, where he saw Gallego making a silencer. (Tr. 324–25) Around the same time, Martinez told Brown that Martinez was looking for Rosado because Martinez and George Gallego wanted to use Rosado's car in the robbery of a postal truck. (Tr. 327–31) After the murder and robbery, Martinez told Brown that "Gio [Rosado] had fucked up and smacked into the back of a postal truck." (Tr. 341)

The fourth witness, Fernando Vega, testified without immunity. (Tr. 1173–92) Shortly after the robbery and murder, Vega saw Martinez, Rosado, and another person, Joe Amato, standing beside Rosado's damaged car and heard Martinez admit that it had been damaged during the robbery. (Tr. 1186–87) Vega later heard Martinez discuss the robbery, how Rosado's car had been damaged, and how someone had been shot. (Tr. 1188–89)

The government introduced substantial proof apart from the witnesses who testified to Martinez' admissions and conduct. Gregory Cintron, who does not know Martinez and testified pursuant to a cooperation agreement, related a conversation that he had with George Gallego on January 21, 1993, soon after the robbery and murder. (Tr. 847–49) George Gallego then stated that someone who lived in his building, which the jury was entitled to conclude was a reference to Martinez, also participated in the robbery. (Tr. 849)

The government introduced also George Gallego's plea minutes in which he admitted to participating in the charged conspiracy to murder with others. (Tr. 699–702; GX 3474–K)

---

**7.** Brown previously had told the government that he did not know that his two friends, Martinez and Rosado, had been involved in the robbery and homicide. (Tr. 375–76) He evidently insisted on immunity to avoid prosecution for perjury.

Finally, the government introduced telephone records and a chart depicting telephone activity which strongly suggested contact between Martinez and his accomplices. (Tr. 1239–47; GX 228; GX 234A) The telephone activity corroborated the testimony of various witnesses that Martinez was the link between Rosado and the Gallego brothers, for the records revealed no calls between Rosado and either Gallego brother. (GX 234A) It did, however, show extraordinary contact between Martinez and George Gallego right after the robbery and homicide. (GX 234A)

*The Defense Case*

Both the co-defendant, Alfredo Gallego, and Martinez presented evidence. Gallego called Glen Montalvo, who testified that Rosado worked in the postal facility which the victim regularly visited in the course of his duties. (Tr. 1321–23) Gallego himself testified, admitting to participating in the robbery while steadfastly denying that he had any intent to kill the victim. He asserted also that Martinez had not been involved. (Tr. 1329–33)

Martinez called only one witness, his mother. Mrs. Idali Martinez testified that her son, in January 1993, routinely ate dinner at her house, that Martinez, as a general rule, left his own home for hers between 5:15 and 6:15 p.m., and that he usually returned between 8:15 and 9:15 p.m. (Tr. 1395–96)

Martinez did not testify. During the trial, Martinez' trial counsel, Patel, at first stated that the defense was not sure whether Martinez would testify. (Tr. 791) Later, he said that he anticipated that Martinez would testify. (Tr. 1319) After Gallego and Mrs. Martinez testified, Patel represented to the Court, in Martinez' presence, that "Mr. Martinez has informed me over lunch that he wishes not to testify." (Tr. 1402) Martinez did not respond to the statement.

Before resting on February 6, 1996, Patel read a stipulation to the jury which included several pages of the transcript of the government's summation in the Rosado trial. (Tr.

1412–16; GX 3567–A) In the quoted portion of the transcript, the government had argued, among other things, that Rosado was the person whom Robert and Gail Lazzaro observed walking along New York Avenue in Fort Lee, New Jersey, where the postal truck containing Gonzalez' body was found. It had contended also that Martinez had smoked Newport cigarette butts that were found in Rosado's car and in a Heineken beer bottle recovered on New York Avenue, both contentions that the government no longer asserted in Martinez' trial.

*The Government's Rebuttal Case*

In rebuttal, the government recalled Postal Inspector Edwin Cuebas to testify concerning telephone calls from and to Steven Martinez' residence during January 1993. (Tr. 1424) This evidence severely undercut the testimony of Mrs. Martinez by establishing that, on the majority of occasions when her son supposedly was dining at her home, calls emanated from, or were received by, someone at her son's home. (GX 239–A) Other testimony had established that Martinez' family previously had moved to Atlanta, Georgia, and that only Martinez was living in his apartment at that time. (*See, e.g.,* Tr. 1390)

*Post–Trial Proceedings*

At a conference on May 31, 1996, well after the verdict, Martinez complained bitterly about Patel's representation and requested the appointment of new counsel. The Court appointed present counsel, Frederick H. Cohn, Esq., to represent Martinez.[8] (Abrams Ex.J)

*Martinez' Decision Not to Testify*

■ Martinez asserts that Patel conveyed to him a threat made by an unnamed Assistant United States Attorney to prosecute Martinez' wife and mother if Martinez testified and that this threat prevented him from doing so. (Martinez Aff. 2–4) His testimony, Martinez claims, would have been central to his defense that he was having dinner with his mother on January 21, 1993, that he was

---

8. Martinez began to complain about Cohn even before the Rule 33 motion was filed. (Abrams Aff.Ex.R at 2–8) Subsequent to the filing of the motion, Martinez wrote the Court a letter, dated

August 29, 1996, seeking Cohn's replacement. (Abrams Aff.Ex.F) After receiving a response (Abrams Aff.Ex.G), the Court denied the application.

not present when certain steps were taken to prepare for the robbery and homicide, and that portions of the government's evidence, such as the telephone calls from Martinez to Rosado, were innocuous. (Martinez Aff. 2, 7)

Martinez' allegations are entirely without merit. Having heard hearing testimony on the issue from Martinez, his wife, his sister, and Patel, the Court credits Patel's account in all material respects and finds that the testimony offered by Martinez on this issue is unworthy of belief. While an extensive discussion is unnecessary, the following briefly summarizes principal elements of the Court's analysis.

First, there is no evidence whatever that the government ever made any threats. Martinez does not claim that it did so in his presence. (H.Tr.[9] 43) Patel and the prosecutors all denied it.

Second, Martinez' theory as to why the threats were made makes no sense. He argues that the object was to keep him from putting in proof that he was in Atlanta for parts of November and December 1992 [10] and that he inherited a substantial sum in 1992.[11] But the evidence as to the inheritance came in through Martinez' mother before any threats allegedly were made and was not disputed by the government. (Tr. 1394) The evidence as to Martinez' presence in Atlanta simply was not inconsistent with the government's case.[12]

Third, the testimony of Martinez and his wife, who was called to corroborate him, was shot through with inconsistencies. Martinez, for example, said in his affidavit that the

threat of prosecution of his family was tied to Martinez himself testifying. (Martinez Aff. 1–2) At the hearing, however, he first testified that the threat was linked to testimony by his sister and mother.[13] (H.Tr. 33, 34, 36) His wife, moreover, said that Martinez told her of the threat if she or her mother—not Martinez himself—testified and that he did so "throughout the trial." (H.Tr. 83–84) This was inconsistent not only with Martinez' claim that the threat was linked to testimony by Martinez, but with his claim that the threat first was conveyed at a recess following his mother's testimony, which occurred near the end of the trial. (H.Tr. 48)

Fourth, Martinez stood silent when Patel advised the Court that Martinez had decided not to testify. (Tr. 1402) In view of his volubility throughout all of the proceedings in this case, this suggests that he concurred in the statement. Nor is his silence satisfactorily explained on the theory that he feared that objection would provoke the government to make good on the supposed threat. He certainly is complaining loudly now, and he has not suggested any reason to believe that any threat is less credible today than it was during the trial.[14]

Nor is there any lack of a reasonable alternative explanation for what occurred. The government had no forensic evidence linking Martinez to the crime. Each of its witnesses was subject to substantial attack.[15] Alfredo Gallego had testified that Martinez was not involved (Tr. 1338–39), and Martinez thought he had done well on the stand (H.Tr. 223–24). Martinez was concerned that he

---

**9.** "H.Tr." refers to the transcript of the hearing on the motion for a new trial.

**10.** Martinez views the evidence about his presence in Atlanta as undercutting Harney's testimony concerning the trip to scout the post office.

**11.** The evidence concerning the inheritance supposedly would have negated any financial motive.

**12.** Harney's testimony was consistent with Martinez' presence in Atlanta at the times he claimed.

**13.** When his counsel led him, he reverted to the story contained in his affidavit. (H.Tr. 36)

**14.** The Court would reach the same result independent of Martinez' silence in the face of Patel's statement for all of the other reasons expressed in this opinion.

**15.** Harney has a drinking problem and was seeking to avoid prosecution for his own possible involvement in the crime. (Tr. 217, 224–28, 242–45) McAuley's testimony as to the overheard statements was shaky because she had been drinking at the time and arguably questionable given her failure to come forward earlier, peculiar behavior for one who then was an applicant to become, and soon became, a police officer. (Tr. 133–34) Vega was a drug user. (Tr. 238, 1175–78) Brown testified under a grant of immunity.

would come off badly if he testified. (H.Tr. 235) Hence, Martinez probably concluded that the risks of taking the stand himself outweighed the benefits.

In sum, the Court finds that there were no threats made and that Patel said nothing to Martinez that reasonably could have been so construed. Martinez' contrary testimony is inaccurate. Indeed, the Court finds, as Patel testified, that Patel told Martinez that the decision was Martinez' to make, advised him to testify, and told Martinez of the reasons for his view. It finds also that Martinez made the decision not to testify and that he did so with full awareness of his rights and of the potential consequences. He knowingly and intelligently waived his right to testify in his own defense.

*The Allegations that Orden and Patel Failed Adequately to Prepare Martinez' Defense*

Martinez alleges that Orden did "virtually nothing on the case, except to coerce [him] into signing affidavits to suppress [his] statement[s]." (Martinez Aff. 4) In his affidavit, Orden details discussions that he had with Martinez regarding possible witnesses and efforts to contact such witnesses. He denies having coerced Martinez into signing the affidavit submitted with Martinez' pretrial motions. (Orden Aff. ¶¶ 3–6; Abrams Aff.Ex.A)

Martinez likewise charges Patel with having failed to investigate and prepare his defense. Martinez asserts that he alerted Patel to the existence of documents and witnesses who would have undermined the credibility of the government witnesses and buttressed his alibi defense. (Martinez Aff. 3–6)

First, Martinez alleges that Simone Aguilera and Jacqueline Zacharie, in conjunction with autobody shop records showing that Martinez' Audi was repaired at various times in November and December 1992, would have discredited Harney's account of Martinez driving him to the Parkchester Post

Office to scout out the scene of the robbery. (Martinez Aff. 4–5, Ex. A) Patel reasoned that the proffered evidence, even if received, would not have impeached Harney, as Harney did not specify any particular day in November or December when he scouted the Parkchester Post Office with Martinez. (Tr. 205–06; Patel Aff. ¶¶ 13–15)

Martinez next asserts that he urged Patel to call as witnesses his wife, Melanie Martinez, and the wife of George Gallego, Pam Gallego, to explain that much of the phone contact between the residences of Steven Martinez and George Gallego pertained to innocent topics. (Martinez Aff. 3–4) Patel explained that Steven Martinez' move to Atlanta was presented to the jury as part of a planned family relocation. However, Patel's investigation revealed that Mrs. Martinez in fact had left for Atlanta in the middle of the night without prior notice to her husband. Furthermore, it was Patel's understanding that when Melanie Martinez learned that postal inspectors were looking for her husband, she arranged for a friend, Patricia Watson, to call to advise the authorities of his whereabouts. (Patel Aff. ¶¶ 19–24; H.Tr. 133–34) These facts, if presented to the jury, might have altered their view of Martinez' family life and relations with his spouse. (Patel Aff. ¶ 24; H.Tr. 130–33) Patel accordingly viewed Melanie Martinez as a witness fraught with danger for Steven Martinez.

With respect to Pamela Gallego, Patel notes that her husband, George Gallego, had made a proffer to the government shortly before trial. (Patel Aff. ¶ 31) Pamela Gallego therefore was unlikely to cooperate with Martinez' defense. (Patel Aff. ¶ 31) Furthermore, Martinez was in a better position to explain the telephone traffic in his own testimony.[16] (Patel Aff. ¶ 32) Finally, without calling either witness, Pamela Gallego or Melanie Martinez, Patel was able to argue that the calls reflected on the government's chart

---

16. Moreover, unbeknownst to Patel, postal inspectors had interviewed Pamela Gallego in March 1993. Among other things, Mrs. Gallego informed the inspectors that she believed that Melanie Martinez' relocation to Atlanta may have been due to marital problems. (A copy of the Memorandum of Interview of Pamela Gallego, dated March 23, 1993, is attached to Abrams

Affidavit as Exhibit L.) She further stated that the calls in the very early hours of Janaury 22, 1993 were from Steven Martinez and the superintendent of the building to talk about "all the commotion in the building." (Abrams Aff.Ex.L) The truth of that statement is seriously undermined by the frequency and length of the calls that night. (*See* GX 234A)

might have been for other reasons. (*See* Tr. 1528; Patel Aff. ¶¶ 19–24, 30–32)

Third, Martinez faults Patel for not calling Sylvester Lewis, who allegedly would have testified that Martinez left for Atlanta "around the time of the Super Bowl." This supposedly would have contradicted Brown's testimony that Martinez complained to Brown in person, before Martinez moved to Atlanta, that Harney had notified authorities in response to a reward poster distributed by the Post Office. (Martinez Aff. 7–8; Tr. 344–45, 357–59) Patel stated in his affidavit that he made efforts to contact Lewis, but that his calls were not returned, and that he ultimately learned that Lewis had retained counsel and did not wish to cooperate with Martinez. (Patel Aff. ¶¶ 35–38) Moreover, evidence at trial showed that the distribution of the reward poster began approximately one week after Gonzalez was murdered, somewhere around January 28, 1993 (Tr. 1279), which was approximately three days prior to the Super Bowl game on January 31, 1993. Lewis' testimony, as proffered by Martinez, therefore would not have contradicted Brown's testimony. Further, if Lewis had testified, he would have been confronted with tape recorded statements that he made to Rosado from which one easily can infer that Lewis knew that Martinez was involved in the robbery.[17]

Fourth, Martinez contends that Patel should have called Sandy Reekstin, who supposedly would have testified that Martinez "was not in New York at a critical time." (Martinez Aff. 8) Martinez does not specify what "critical time" he refers to, but the government did not contend that Martinez was in New York on any specific dates other than January 14 and 21, 1993. Patel explained that Reekstin resisted Patel's efforts to reach her and then ultimately hired coun-sel and decided not to cooperate with Martinez' defense. (Patel Aff. ¶¶ 36–38)

Next, Martinez contends that Joe Amato, the person who repaired Rosado's car, and William Houston, the government's accident reconstruction expert, also should have been called on the defense case. (Martinez Aff. 8) Patel attempted to interview Amato. However, Amato's counsel objected to his client's speaking with Patel. (Patel Aff. ¶ 33) Patel correctly notes that calling Amato as a witness in absence of a prior interview would have been quite risky,[18] especially in view of Amato's status as the subject of an ongoing grand jury investigation.[19] (Patel Aff. ¶¶ 33–34) Moreover, even a cursory review of Amato's testimony at Rosado's trial reveals that Amato would have been subject to vigorous impeachment. (Abrams Aff.Ex.O)

Similarly, it is hard to imagine how Houston's testimony, which demonstrated that Amato's tale regarding how Rosado's car had been damaged could not have been true, could have assisted Martinez in his defense. While Houston originally suspected that the damage to the Cavalier could have been caused by two separate accidents, Houston stated in his final report that the damage sustained by the Cavalier was consistent with an accident occurring in the fashion described by Rosado. (Abrams Aff.Ex.P)

Martinez maintains, finally, that Patel should have called Robert Lazzaro who, in the Rosado trial, described someone resembling Rosado, not Martinez, walking on New York Avenue in Fort Lee, New Jersey, where the postal truck and victim's body were found. (Martinez Aff. 8) Martinez argues that this live testimony would have undermined the government's case far more than Patel's introduction of various portions of the government's summation in the Rosa-

---

17. A copy of the transcript (GX 196T) of that tape, (GX 196), is attached to the Abrams affidavit as Exhibit M.

18. Martinez notes that Patel might have been free to contact Amato without his lawyer's consent, since he arguably was not a "party" to the same action. *See Grievance Committee for the Southern District of New York v. Simels,* 48 F.3d 640 (2d Cir.1995) (narrowly defining "party" in application of disciplinary rule prohibiting attorney from communicating with a party to the same action that is represented by counsel). There is no evidence, however, that Amato would have spoken with Patel, much less that he would have testified or that his testimony would have been helpful.

19. Amato recently was indicted for perjury in connection with the investigation of these events. *United States v. Amato,* 96 Cr. 936 (KMW) (filed Sept. 30, 1996).

do trial into the record. (*Id.*) Patel explained that he made the difficult decision whether to call Lazzaro with Martinez and that Martinez agreed with the ultimate decision not to call him as a witness. (Patel Aff. ¶ 42) Patel recognized that calling Lazzaro at trial risked a possible in court identification of Martinez. A statement by Lazzaro that Martinez in fact was the person walking on New York Avenue on January 21, 1993 would have been devastating to the defense. (*Id.*) Presenting Lazzaro's former testimony, including his description of a person who resembled Rosado more than Martinez, and the government's argument at the prior trial that in fact it was Rosado, offered a safer means to the same end. (*Id.* ¶ 43)

*The Other Allegations Regarding Patel's Representation at Trial*

■ Martinez lodges additional complaints regarding Patel's representation of him during the trial. He complains that Patel should not have agreed to the entry of the protective order that prohibited the defense, when interviewing third party witnesses, from revealing that George Gallego was the person who provided information accusing the defendants. (Martinez Aff. 9–10; Tr. 291–93) Patel indicate that he discussed the contents of George Gallego's statements with Martinez and appears not to have felt hampered by the protective order. (Patel Aff. ¶ 45) Moreover, Martinez does not specify how this restriction inhibited Martinez' defense. Regardless of the defendant's position on the protective order, the Court had the supervisory authority to enter the order to protect George Gallego and his family.

Patel's representation is said by Martinez to have been deficient also due to his failure to subpoena an informant who allegedly stated that Rosado was the shooter.[20] (Martinez Aff. 10) The "confidential informant" referred to in that memorandum was Habib Ullah who, Patel explained, already had testified falsely about Martinez on a prior occasion. (Patel Aff. ¶ 46) Significantly, the government conducted further investigation and learned that Ullah and the person to whom

Ullah originally provided the information both recalled that Ullah never said that Rosado was the shooter. (Abrams Aff. ¶ 4)

Martinez faults Patel for not questioning Gail Lazzaro to establish that the person she saw on New York Avenue was Rosado and that only three persons were present on the street on January 21, 1993. (Martinez Aff. 10) Patel explained that Ms. Lazzaro did not identify Martinez and that cross-examining her on the issue therefore only would have raised the possibility of speculation in the minds of the jurors as to who that person was. (Patel Aff. ¶ 47)

Martinez appears to complain that his trial counsel should have attempted to introduce Martinez' prior statements to postal inspectors in which he denied participating in the crime. (Martinez Aff. 10) Patel responded that well settled law precluded the introduction of such statements. (Patel Aff. ¶ 48)

Finally, Martinez complains that Patel did not provide him with copies of the government's witness statements and other material until the morning of trial. (Martinez Aff. 11) Patel states that Orden informed him that he had furnished Martinez with numerous documents before trial. In addition, Martinez was given daily copy of the trial transcript every morning. (Patel Aff. ¶ 49)

*Discussion*

I

*The Legal Standard Governing Ineffective Assistance Claims*

To prevail on his Sixth Amendment claim of ineffective counsel, Martinez must demonstrate both "that counsel's performance was deficient ... [and] that the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *accord, e.g., Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *United States v. Coffin,* 76 F.3d 494, 497–98 (2d Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996). The attorney must be shown to have committed

---

**20.** This statement is contained in GX 3525–C, a copy of which is attached to the Abrams affidavit as Exhibit Q.

errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In assessing an attorney's conduct, the reviewing court must engage in a "highly deferential" review of the attorney's conduct and must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. A reviewing court, rather than "grade counsel's performance," limits itself to determining "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." *Id.* at 696, 104 S.Ct. at 2069; *see also United States v. Aguirre,* 912 F.2d 555, 561 (2d Cir.1990).

■ In weighing complaints from convicted defendants concerning counsel's preparation and trial performance, courts long have recognized that "there are countless ways to provide effective assistance in any given case" and that "even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, *see also United States v. Aguirre,* 912 F.2d at 560. Recognizing the many difficult decisions that confront counsel in preparing for trial, the Supreme Court has emphasized that an attorney's:

> "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

In reviewing the appropriateness of the many strategic decisions made by counsel, the reviewing court should judge counsel's conduct as of the time counsel acted and not employ hindsight to fault counsel's strategic decisions. *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994). Decisions to

call or bypass particular witnesses, which have been recognized to be peculiarly a matter of professional judgment, are "practically never second-guess[ed]." *United States ex rel. Walker v. Henderson,* 492 F.2d 1311, 1314 (2d Cir.), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144 (1974); *see also United States v. Helgesen,* 669 F.2d 69, 72 (2d Cir.), *cert. denied,* 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982).

■ Even if a defendant establishes incompetence, the defendant is not entitled to a new trial unless he or she demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *accord, e.g., United States v. Coffin,* 76 F.3d at 498.

■ Evaluation of counsel's effectiveness in the context of a defendant's decision whether to testify presents other issues. A defendant, of course, has a constitutional right to testify in his or her defense. The decision whether to do so ultimately belongs to the client, not the lawyer. *See, e.g., DeLuca v. Lord,* 858 F.Supp. 1330, 1352–56, 1360–61 (S.D.N.Y.1994), *aff'd on other grounds,* 77 F.3d 578 (2d Cir.1996). This Court assumes, without deciding, moreover, that the assistance of counsel, in order to meet the constitutionally required threshold of effectiveness, must include advice to the client as to whether to testify in a given case. *See United States v. Vargas,* 920 F.2d 167, 170 (2d Cir. 1990) (counsel's reasonable advice not to testify dispositive of ineffective assistance claim); *cf. Boria v. Keane,* 99 F.3d 492 (2d Cir.1996) (failure to advise whether proposed plea bargain advisable renders assistance of counsel ineffective). Given the Court's findings of fact, it is unnecessary to rule on this issue.[21]

## II

### *Martinez Has Not Established Ineffective Assistance*

#### *Martinez Waived His Right To Testify*

Martinez was told that the decision whether to testify was his to make. He was ably

---

21. Nor, for the same reason, is it necessary here to address the question whether a defendant's failure to protest when defense counsel rests

without calling the defendant as a witness in and of itself waives the defendant's right to testify in his or her own behalf.

advised as to the merits of taking the stand. As indicated, he deliberately and intelligently chose not to do so. He therefore knowingly and voluntarily waived his right to testify. His claim of ineffective assistance in this regard is a fabrication.[22]

*Counsel Adequately Investigated and Prepared Martinez' Defense*

■ Martinez claims that his prior counsel failed to follow numerous leads. This contention is without merit.

To begin with, Martinez had no alibi even if all of the witnesses whom he now claims should have been called had testified just as Martinez claims they would have. The government placed Martinez in New York only on January 14 and 21, 1993 and on the unidentified date in November or early December 1992 when the Post Office was scouted. All of the evidence to which Martinez points would have established only that Martinez was in Atlanta on some days in November and December, in New York on others, and that he relocated to Atlanta shortly after the murder. The evidence he claims should have been adduced therefore would have proved nothing. Indeed, Martinez' present counsel implied that none of this evidence would have been significant unless Martinez had testified and even then it would have been important only by corroborating him on inconclusive details. (H.Tr. 240–41; Def. Mem. 8)

■ The claims of incompetence have been rebutted by the affidavits and Patel's testimony. The Court is inclined to accept Orden's assertion that he pursued every lead that Martinez gave him, but was hampered by Martinez' failure to tell him where he was to establish his alibi. (Orden Aff. ¶¶ 4–5)

Without having provided his attorney with specific information as to his location, counsel hardly could have been expected to find witnesses buttressing the defendant's alibi. In any case, Orden turned the case over to Patel sufficiently in advance of trial so that any lack of preparation on his part did not prejudice Martinez in view of Patel's subsequent efforts. The Court rejects Martinez' assertion that Patel had insufficient time in which to prepare and, indeed, finds that Patel's defense substantially exceeded the constitutional minimum.[23]

■ Patel credibly has answered the many charges of incompetence leveled by Martinez. He cannot be faulted for not introducing records demonstrating that Martinez' Audi had repair work in 1992 because the repair dates did not conflict with Harney's testimony as to when Martinez, Harney, and others scouted the Parkchester Post Office. Nor can he be faulted for not having called Jacqueline Zacharie or Simone Aguilera to testify about the repair work. Their testimony would not have negated any government proof. Moreover, Martinez did not suggest to Patel that these witnesses be called, and Patel saw no reason to call Aguilera as a result of his conversations with her.[24] Had Aguilera testified, she would have been confronted with statements that she made to postal inspectors about Martinez beating his wife and with statements in which Aguilera revealed that she had heard that Steven Martinez was involved in the robbery of the postal truck driver. (Abrams Aft.Ex. K, N)

■ Patel had ample basis for believing that calling the defendant's wife, Melanie Martinez, would have posed significant risks.

---

22. Martinez makes much of Patel's note in his diary concerning Martinez' alleged decision not to take the stand. He implies, among other things, that the note was untruthful because Patel otherwise would have advised the Court that Martinez' decision was against Patel's advice. Indeed, he implies that the diary note was an attempt at self-protection that betrays Patel's awareness that there was a problem with the circumstances surrounding Martinez' failure to take the stand. (*See* H.Tr. 220–25, 236037, 247–50) The Court finds, however, that the note was truthful, that it was written to record an unusual

event, and that Patel honestly saw no reason to put any more on the record than he in fact did.

23. Apart from its own assessment of Patel's trial performance, the Court notes that Martinez' present counsel described Patel as "a careful guy" and characterized the file Patel turned over to him as "absolutely impeccable." (H.Tr. 244)

24. The Court does not credit Aguilera's testimony that she never spoke to Patel. Her long and close relationship with Martinez' wife made her an intensely interested witness. (H.Tr. 100–03)

Had she taken the witness stand, Ms. Martinez might have been forced to reveal that she had "left with the children in the middle of the night without telling Mr. Martinez" (Patel Aff. ¶ 20), thereby discrediting the image of a solid family that counsel tried to paint for the jury. (Patel Aff. ¶ 24 H.Tr. 131–32)

■ Met with a lack of cooperation from Sylvester Lewis and Sandy Reekstin (Patel Aff. ¶¶ 35–38), Patel understandably choose not to call them as witnesses. Had Lewis taken the stand, he would have been subject to cross-examination concerning statements he made to Rosado, which were on tape and clearly indicated that he knew that Martinez was involved in the robbery. (Abrams Aff. Ex. M)

■ Patel's decision not to call Joe Amato or William Houston, both of whom could have testified concerning the accident damage to Rosado's car, was sound. Patel believed that Amato was under investigation and would not seek to help his former client. (Patel Aff. ¶ 34; H.Tr. 149) In addition, Amato's testimony at the Rosado trial, in which he claimed that Rosado's car was damaged by a Chevy Suburban, was not credible. Had he maintained that version of events, which the accident reconstruction expert, William Houston, would have said is inconsistent with the actual accident damage, his testimony would have enhanced, rather than diminished, the government's prospects. (Abrams Aff.Ex.O) Further, Houston generated a report which concluded that the accident damage to the car was consistent with Rosado's testimony. (Abrams Aff.Ex.P)

■ Patel's decision not to call Elaine Martinez, Martinez' sister, and Pam Gallego, the wife of George Gallego, was within the bounds of appropriate professional judgment. Elaine Martinez had no recollection of any pertinent events and did not recall driving her brother to their mother's house on the day of the robbery and homicide, thereby undermining the defendant's statements to

that effect. (Patel Aff. ¶¶ 25–26; Abrams Aff.Ex.U (memorandum of interview of Elaine Martinez); H.Tr. 151–54) Patel concluded that Pam Gallego, the wife of a co-defendant who recently had pleaded guilty would not likely have exonerated his client. (Patel Aff. ¶ 31)

■ Finally, Patel's decision not to call Robert Lazzaro was sound. By not calling Lazzaro as a defense witness, Patel avoided the risk that Lazzaro would identify Martinez in court. At the same time, Patel ensured that the jury heard Lazzaro's description of the person walking in front of his house, a description that resembled Rosado (and not Martinez), by reading into evidence the pertinent contents of the Government's summation in the Rosado trial. (Patel Aff. ¶ 43; H.Tr. 150–51) The Court finds, moreover, that Martinez agreed with this strategy.

*Patel Adequately Defended Martinez During the Trial*

■ Contrary to Martinez' present claims, Patel did share with Martinez the information contained in George Gallego's proffer and did provide Martinez with a copy of the pertinent documents. (Patel Aff. ¶ 49)

■ Patel rightly did not seek to admit the defendant's pretrial admissions, as these statements would have been inadmissible. *United States v. Cardascia,* 951 F.2d 474 (2d Cir.1991).

■ Finally, Patel wisely did not seek to subpoena the informant who supposedly said that Rosado was the shooter. The only informant in this case who could have made that statement was Habib Ullah, who told the government that he never made such a statement. (Abrams Aff. ¶ 4)[25] Had Ullah testified and repeated the testimony that he gave during the Rosado trial, he would have implicated Martinez and denied making the statement that Rosado was the shooter. (Abrams Aff.Ex.S).

25. The person to whom this alleged informant made this statement also was interviewed by the government. He denied that Ullah or anyone else ever told him that Rosado was the shooter.

(Abrams Aff. ¶ 4) Thus, the information in the police report was repudiated by its purported source.

III

*In Any Case, Martinez Was
Not Prejudiced*

██ Martinez' motion would fail even if Patel had not so thoroughly refuted Martinez' claims of ineffectiveness by showing that each decision was the product of reasoned professional judgment amply based in the facts known to him at the time. There simply is no reason to believe that the outcome would have been different had all of the evidence to which Martinez now points been addressed.

Most of Martinez' complaints go to his "alibi" evidence—evidence that he was in Atlanta in late 1992 and early 1993. As noted, however, his evidence would not have established an alibi. It was entirely consistent with the government's theory. It would have showed only that Martinez was back and forth between Atlanta and New York in November and December and that he moved to Atlanta after the murder. (*See also* H.Tr. 245) (car repair records, according to Martinez' present counsel, "by themselves prove nothing")

He claims also that he was prevented from showing that he inherited about $30,000 in 1991 and 1992, which he says would have undercut the alleged economic motive for the crime. But, as indicated previously, his mother testified that he received the money after his father died in 1991, and the government did not challenge the testimony.

One could go on at significantly greater length, but little would be gained. In the last analysis, Martinez has pointed to nothing which, singly or in combination, casts any doubt on the conclusion that the jury would have convicted him even if everything he has mentioned in his motion had been before it. (*See also* H.Tr. 240–41)

*Conclusion*

For the foregoing reasons, the motion for a new trial is denied in all respects. The foregoing constitute the Court's findings of fact and conclusions of law. The Court notes also that it has not considered the brief portions of the final transcript that were unsealed during the hearing on this motion. (*See* H.Tr. 23, 39)

SO ORDERED.

**ADDENDUM TO OPINION**

This Court issued an opinion in this case, which denied defendant Martinez' motion for a new trial, on November 6, 1996. As the motion was premised on the claim that Martinez received ineffective assistance of counsel, the opinion discusses affidavits and testimony given by two of Martinez' former lawyers, both of whom were appointed pursuant to the Criminal Justice Act.

It has been suggested to the Court that one reading the opinion without knowledge of the applicable principles and of the history of the case might conclude that the attorneys in question, or CJA appointed lawyers in general, were willing "to give up a client apparently to protect" themselves. Such an impression would be entirely misconceived.

By moving for a new trial based on the alleged ineffectiveness of counsel, Martinez put in issue various communications between himself and his counsel and, at least to that extent, waived his attorney-client privilege. His former counsel nevertheless declined to make themselves available to the government in connection with the government's preparation of a response out of concern that doing so would reveal privileged communications going beyond the scope of the waiver of the privilege or otherwise violate their duties to Martinez. The Court therefore requested that former counsel review Martinez' motion and prepare drafts of responsive affidavits. The drafts then were furnished only to the attorney representing Martinez on the motion in order to permit Martinez to claim, if he thought it appropriate, that anything contained in the draft affidavits was privileged notwithstanding the waiver inherent in Martinez' having made his motion. Only after satisfying himself that the proposed affidavits did not exceed the scope of the waiver, or obtaining the Court's ruling as to any point on which a claim of privilege was made, did Martinez' motion counsel turn the affidavits over to the government for use in preparing its response. Subsequently, one of Martinez' former counsel testified at an evi-

dentiary hearing at which Martinez and his motion counsel both were present and thus able to object to any proposed testimony.

In these circumstances, it is evident that Martinez' former counsel conducted themselves with all appropriate fidelity to their erstwhile client. They did not volunteer information and cooperated only after Martinez' legitimate interests were protected and only to the extent necessary in light of the motion that Martinez made.

SO ORDERED.