UNITED STATES of America,
Appellee,

v.

George GALLEGO, Defendant,

Steven Martinez and Alfredo Gallego,
Defendants–Appellants.

Docket Nos. 96–1739, 96–1748,
98–1200, 98–1212.

United States Court of Appeals,
Second Circuit.

Argued: April 8, 1999.

Decided: Sept. 2, 1999.

Theodore S. Green, Green & Willstatter, White Plains, NY, for Defendant–Appellant Steven Martinez.

Deborah I. Meyer, Law Office of Sam A. Schmidt, New York, NY (Sam A. Schmidt and R. Patrick Seguritan, on the brief), for Defendant–Appellant Alfredo Gallego.

Robin E. Abrams, Assistant United States Attorney, New York, NY (Mary Jo White, United States Attorney, Southern District of New York, Nancy L. Kestenbaum and Alexandra A.E. Shapiro, on the brief), for Appellee.

Before: WINTER, Chief Judge, NEWMAN and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

This case arises out of the brutal murder of Guillermo Gonzalez, a postal truck driver shot in the head from close range while completing his mail delivery route in the Bronx, New York. Following a jury trial in the United States District Court for the Southern District of New York (Kaplan, J.), Steven Martinez and Alfredo Gallego ("defendants") were convicted of conspiring to murder and murdering a postal worker, in violation of 18 U.S.C. §§ 1117, 1114 and 1111. Martinez was further convicted of conspiring to rob and robbing Gonzalez, who was in lawful possession of United States property, in violation of 18 U.S.C. §§ 371 and 2114. For the reasons to be discussed, we reject defendants' numerous objections to the lower court proceedings and affirm their convictions and sentences.

## BACKGROUND

The district court has thoroughly described the facts of this case in a series of published opinions,[1] and we therefore present only a brief summary here. On January 21, 1993, Guillermo Gonzalez, a United States Postal Service truck driver, was shot and killed while completing his mail route in the Parkchester section of the Bronx, New York. One of Gonzalez's as-

sailants then drove the truck, with Gonzalez's body still inside, across the George Washington Bridge into Fort Lee, New Jersey. That night, after area residents reported seeing the postal truck being driven recklessly into a wooded area, police arrived on the scene and arrested Alfredo Gallego fleeing from the vehicle with his clothing covered in blood.

On February 16, 1993, a grand jury in the Southern District of New York indicted Gallego and charged him with conspiring to rob and assault a postal worker while engaged in the performance of his official duties, robbing a person with lawful control of United States property, assault with a dangerous weapon and carrying a firearm to commit a crime of violence, in violation of 18 U.S.C. §§ 371, 2114, 111 and 924(c). Approximately three months later, on May 7, 1993, Gallego pled guilty to all four counts of the indictment. The police, meanwhile, were making progress in their ongoing investigation into the Gonzalez case. Following up on a tip, the police recovered a vehicle owned by Giovanni Rosado that according to witnesses, had been used to block Gonzalez's truck on the night he was killed. On September 21, 1993, while Gallego was awaiting sentencing, the grand jury indicted Rosado and charged him with conspiracy to commit robbery, robbery and other charges related to the Gonzalez matter.

The court sentenced Gallego on June 8, 1994, and, pursuant to § 5K2.1 of the Federal Sentencing Guidelines, upwardly departed from the robbery guideline range based on Gonzalez's death. Rosado went to trial in September 1994. After his trial resulted in a hung jury, Rosado entered into a cooperation agreement with the government. He provided information against Gallego and others, detailing a plot not only to rob Gonzalez, but also to kill him. On April 10, 1995, a second grand jury indicted Gallego's brother, George

---

1. *See United States v. Gallego,* 944 F.Supp. 309, 311–18 (S.D.N.Y.1996); *United States v. Gallego,* 913 F.Supp. 209, 211–12 (S.D.N.Y. 1996); *United States v. Gallego,* 907 F.Supp. 735, 736–37 (S.D.N.Y.1995).

Gallego, and Rosado's long-time friend, Steven Martinez, for murder, conspiracy to commit murder, robbery and conspiracy to commit robbery. Approximately two months later, on June 27, 1995, the same grand jury returned a superseding indictment adding charges of murder and conspiracy to murder against Alfredo Gallego.

On December 18, 1995, George Gallego pled guilty to the conspiracy to murder charge returned against him in the April 10 indictment. Alfredo Gallego and Martinez were subsequently tried together for two weeks beginning on January 23, 1996. After hearing from numerous witnesses, including Rosado, who testified as to defendants' respective roles in planning and carrying out Gonzalez's robbery and murder, the jury returned a verdict against defendants on all counts.

On appeal, Alfredo Gallego and Martinez challenge numerous alleged errors in the district court proceedings. They argue that (1) the district court erred in its March 31, 1998 decision denying them a new trial on the basis of certain "newly discovered evidence"; (2) the district court improperly admitted various hearsay statements at trial, including portions of George Gallego's plea allocution as well as statements that George Gallego allegedly made during a telephone conversation shortly after Gonzalez was robbed and killed; (3) the Double Jeopardy Clause of the Constitution barred the government from prosecuting Alfredo Gallego for murder and conspiracy to murder after he had already been convicted of robbery and his sentence had been enhanced based on Gonzalez's death; (4) Martinez was denied his right to be present throughout his trial when the district judge questioned prospective jurors outside of Martinez's presence regarding their possible biases; and (5) the trial court improperly admitted testimony from witnesses who were cooperating with the government pursuant to written plea agreements, a practice rejected by the Tenth Circuit in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998),

*rev'd,* 165 F.3d 1297 (10th Cir.1999) (*en banc*). We find no merit in defendants' contentions.

## DISCUSSION

### I. Defendants' Rule 33 Motion

Following their convictions, defendants moved the district court for a new trial on the basis of newly-discovered evidence pursuant to Fed.R.Crim.P. 33. In support of their Rule 33 motion, defendants relied on the following: (1) inconsistencies between Rosado's trial testimony and subsequent statements by George Gallego, who became a cooperating witness after defendants' trial; (2) new evidence suggesting that Cintron, a government witness, perjured himself at trial; (3) new evidence suggesting that Arthur Brown, another government witness, also perjured himself at trial; and (4) an error in the transcript of a tape-recorded conversation between Rosado and Brown. The district court denied defendants' motion in an March 31, 1998 decision. We review this ruling for an abuse of discretion, and we accept the district court's factual findings unless they are clearly erroneous. *See, e.g., United States v. Underwood,* 932 F.2d 1049, 1052 (2d Cir.1991).

A Rule 33 "motion for a new trial based upon previously-undiscovered evidence is ordinarily 'not favored and should be granted only with great caution.'" *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975) (quoting *United States v. Costello,* 255 F.2d 876, 879 (2d Cir.1958)). Ordinarily, relief is justified under Rule 33 only if the newly-discovered evidence could not have been discovered, exercising due diligence, before or during trial, and that evidence "is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir.1992) (quoting *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980)).

If a defendant presents new evidence establishing perjury by a govern-

ment trial witness, however, a more favorable standard might apply "depend[ing] on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). In particular, where the government knew or should have known about the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir.1982)). Reversal is "virtually automatic" in these cases. *Id.* (quoting *Stofsky*, 527 F.2d at 243). On the other hand, "[w]here the government was unaware of a witness' perjury ... a new trial is warranted only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (quoting *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988)) (alteration in original).

### A. Inconsistencies Between Statements By Rosado and George Gallego

■ In support of their Rule 33 motion, defendants begin by emphasizing a number of perceived inconsistencies between Rosado's trial testimony and George Gallego's subsequent statements as a cooperating witness in the government's investigation. The district court found no indication, nor do we, that any difference between the accounts offered by these two witnesses suggests perjury by either. *See United States v. Gambino*, 59 F.3d 353, 365 (2d Cir.1995) ("[E]ven a direct conflict in testimony does not in itself constitute perjury."). Therefore, we ask simply whether defendants' proffered "new evidence," *i.e.*, George Gallego's post-trial statements, are so material and non-cumulative that they "probably would have resulted in an acquittal." *United States v. Agurs*, 427 U.S. 97, 111 n. 19, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (collecting cases); *see also Siddiqi*, 959 F.2d at 1173. We agree with the district court

that the disputed evidence does not cross or even approach this threshold.

The inconsistencies that defendants identify are immaterial, and, in all significant respects, George Gallego's post-trial statements corroborate Rosado's trial testimony. Defendants complain, for example, that Rosado and Gallego have differing recollections as to how Rosado acquired the gun used to murder Gonzalez. Rosado recalls obtaining the gun directly from George Gallego, while Gallego recalls giving the gun to Martinez to deliver to Rosado. This hardly constitutes a significant inconsistency, particularly given that both witnesses agree about numerous key facts regarding the weapon. Notably, both recall that Martinez did in fact arrange for Rosado to borrow the gun, that Rosado borrowed the weapon to settle a drug dispute and that Martinez encouraged Rosado to obtain the weapon.

George Gallego's post-trial statements involving a gun silencer are likewise fundamentally consistent with Rosado's trial testimony and therefore do little, if anything, to detract from that testimony. As an initial matter, the differences in their recollections are negligible. Rosado recalls seeing George Gallego crafting the silencer at a workbench in Gallego's apartment, whereas Gallego does not recall ever working on the silencer in front of Rosado. Beyond this difference, their recollections are consistent in all key respects. Both Rosado and George Gallego testified that Gallego did in fact craft the silencer at a workbench in his home. The two further agreed that Martinez knew George Gallego was making the silencer, and that it was ultimately used in the Gonzalez murder and robbery. The remaining alleged "inconsistencies" between their accounts follow a similar pattern. Both accounts are fully consistent on the key points incriminating both defendants, and differ only immaterially. Under these circumstances, we conclude that George Gallego's post-

trial statements bolster Rosado's trial testimony and in no way cast doubt on the jury's verdict. We therefore decline to reverse defendants' conviction on the basis of Gallego's post-trial testimony. *See Underwood*, 932 F.2d at 1052–53 (affirming denial of a Rule 33 motion where the newly obtained witness statement "would be more likely to strengthen the government's case than to weaken it.").

### B. Cintron's Perjury

█ In further support of their Rule 33 motion, defendants rely on the government's February 1997 letter alerting defense counsel that one of the government's witnesses, Gregory Cintron, perjured himself during the trial. Cintron's testimony primarily involved a phone conversation he claimed to have had with George Gallego shortly after Gonzalez was murdered. According to Cintron's testimony, George Gallego indicated that he had participated in robbing a mail truck; that his brother, Alfredo, had shot and killed a driver who had resisted their efforts to rob him; that Alfredo had driven the truck to New Jersey with several unnamed accomplices following in two cars; and that one of the other participants in the crime lived in George Gallego's building. Cintron also testified that he had not himself been a direct participant in the crime. This last portion of his testimony was later revealed to be false. On the basis of information that surfaced after trial, the government learned that Cintron had agreed to monitor police and postal radio frequencies on the night of the murder, dispose of the murder weapon and provide a false alibi for George Gallego, all in exchange for $10,000 of the robbery proceeds.[2]

Because the district court detected no basis to conclude that the government was aware of Cintron's perjury at the time of trial, the court applied the more demanding Rule 33 standard pursuant to which defendants could secure a new trial on

account of Cintron's perjury only by establishing that they likely would have been acquitted in the absence of the perjured testimony or had that perjury been exposed at trial. *See Wallach*, 935 F.2d at 456. Nothing in the record suggests that this conclusion about the government's knowledge was clearly erroneous, and we therefore hold defendants to this same high standard. It is a standard that defendants fail to meet. The government presented significant evidence at trial, independent of Cintron's testimony, establishing all of the key facts to which Cintron testified. *See United States v. Wong*, 78 F.3d 73, 82 (2d Cir.1996) (holding that even in circumstances where the government knows of perjury, "where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial").

With regard to Martinez, for example, Cintron made only one statement that could be construed as inculpatory. As explained, Cintron testified that during their phone conversation on the night of the murder, George Gallego mentioned that "somebody" living in Gallego's apartment building participated with him in the crime. Although Martinez did in fact live in George Gallego's building, this vague reference to an unnamed person was hardly a key piece of evidence in the government's case against Martinez. Rather, the government elicited extensive testimony from a number of witnesses, including Rosado, that directly implicated Martinez in planning and carrying out the robbery against Gonzalez. Other witnesses, several of whom appeared without plea agreements from the government, further testified that Martinez had attempted to recruit them into participating in the robbery, or that they had overheard Martinez discussing the robbery, both before it happened and after it was completed. Phone and pager records

---

**2.** The government informs the Court that Cintron was tried and convicted in November 1997 of being an accessory after the fact to the Gonzalez murder and robbery.

provided an additional link between Martinez and the Gallego brothers, while directly refuting Martinez's claim that he was uninvolved with any of the conspirators at or around the time of Gonzalez's murder. In light of this substantial testimony and evidence, we are satisfied that Martinez would have been convicted even without Cintron's testimony or even if that perjury had been revealed at trial.

Although Cintron's testimony more directly implicated Alfredo Gallego in the Gonzalez incident, the remaining evidence against Gallego similarly provided overwhelming independent support for his conviction. As an initial matter, relatively little of the case against Alfredo Gallego was ever in doubt. Alfredo Gallego himself testified at trial that he participated in formulating and carrying out the robbery, and only disputed, first, whether he was the participant who actually shot Gonzalez and, second, whether Gonzalez's murder was a part of the group's plan. Numerous other witnesses further confirmed Alfredo Gallego's involvement by describing assorted meetings that took place in advance of the robbery, by recounting a "dry-run" or rehearsal of the robbery, and by explaining that Martinez and the Gallego brothers sought to enlist them to help conceal evidence following the crime. As for Alfredo Gallego's contention that he did not shoot Gonzalez and that there was no understanding among the conspirators that Gonzalez might be killed, there was overwhelming evidence to the contrary here as well. Most obviously, Gonzalez was in fact killed, and Alfredo Gallego was found covered in his blood. Forensic evidence further confirmed that Gonzalez was shot at close range and without a struggle. It was also apparent that Gonzalez was fired upon from an angle placing the shooter at approximately the same location that Alfredo Gallego had apparently assumed during one of the robbery rehearsals, thus suggesting that Gallego shot Gonzalez according to plan. Additional evidence, including several eyewitness accounts, established that the Gallego brothers crafted a gun silencer for use during the robbery. Furthermore, in his trial testimony, Rosado described a meeting with Martinez and the Gallego brothers in which George Gallego specifically announced that the conspirators planned to murder a postal truck driver. Finally, Rosado testified that on the night of the robbery, just after George Gallego announced over a set of walkie-talkies that Gonzalez's truck was moving into position for the robbery, Alfredo Gallego boasted to Martinez, "tell him [George Gallego] I am about to murder somebody."

To the extent that defendants propose that they could have used evidence of Cintron's perjury to destroy his overall credibility as a trial witness, it is also significant that Cintron's testimony was beneficial to Alfredo Gallego on a key issue in this case. In describing his conversation with George Gallego on the night of the murder, Cintron testified that Gallego reported to him that the driver of the truck was killed only because he struggled as defendants attempted to gain control of his postal vehicle. This was consistent with Alfredo Gallego's argument at trial that Gonzalez's murder was not premeditated but occurred spontaneously when Gonzalez resisted being robbed. In his closing argument, in fact, Alfredo Gallego's attorney relied on Cintron's testimony to make exactly this point. Apparently, the jury was unpersuaded. The fact remains, however, that Cintron's testimony was not uniformly damaging to defendants, and it is not at all clear, therefore, that discrediting that testimony would have improved defendants' prospects for acquittal.

■ We nevertheless note that the district court erred in the manner in which, in evaluating whether defendants would have been convicted "but for" Cintron's testimony, it considered certain inculpatory evidence presented in conjunction with that testimony. Specifically, while acknowledging that the government relied on Cintron to identify assorted

physical evidence introduced at trial, the court hypothesized that "[w]ere a new trial granted, the same evidence could be identified" and introduced through other witnesses, including George Gallego. This conjecture was inappropriate.[3] The trial court could have considered the disputed physical evidence had the government identified actual trial testimony from witnesses other than Cintron supporting its admission, but the court was not at liberty to consider that evidence by relying on George Gallego's presumed ability to introduce it through his testimony at a future proceeding. Indeed, it is inconsistent with the applicable "but for" standard for the government or the court to evaluate a Rule 33 motion by replacing perjured trial testimony with hypothetical testimony that was not delivered to the jury. Such a practice would also raise serious concerns under the Confrontation Clause, U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."). This error had no impact on the proper resolution of defendants' motion, however. As detailed above, the government presented extensive evidence at trial, independent of Cintron's testimony, establishing defendants' guilt. It is also apparent that Cintron's testimony, in certain respects, may actually have helped defendants more than it hurt them. Accordingly, it is unlikely that defendants would have prevailed at trial absent Cintron's testimony, and we therefore affirm the district court's decision rejecting defendants' contention that Cintron's perjury warrants a new trial under Rule 33.

**C. Arthur Brown's Recanted Testimony**

Defendants argue that Arthur Brown perjured himself at trial, citing an affidavit he subsequently signed recanting his testimony. At trial, Brown testified to certain statements that Martinez allegedly made to him before and after the Gonzalez murder. In particular, Brown testified that during a conversation in a bar in the Bronx, Martinez revealed to him that George Gallego planned to use Rosado's car "for a robbery on a postal truck." Brown further testified that Martinez later described an accident involving Rosado's car and a postal truck. Brown also testified, however, that Martinez said nothing in any of their conversations to suggest his own involvement in the plot. In fact, in describing one of his conversations with Martinez after the murder, Brown insisted that Martinez, his long-time friend, denied any involvement in the crime whatsoever.

■ Several months after trial, Brown recanted his testimony in an affidavit, claiming that he did not actually discuss the robbery with Martinez directly and that he learned of the crime only from "another source over a period of time." Then, in a second affidavit, Brown recanted his initial recantation, insisting that his trial testimony was truthful and that he signed his previous affidavit only because Martinez's wife pressured him to do so. In evaluating defendants' claim that this scenario indicates Brown's perjury at trial, the district court expressed hesitation to credit Brown's initial recantation and ultimately concluded that defendants would have been convicted even without his allegedly perjured testimony. We agree.

**3.** The government apparently invited the district court also to consider inculpatory statements by a number of witnesses, including James Kelly, that were made to the government after trial. Although the government has not persisted on this point and has not asked this Court to rely on any testimony or information not actually presented at trial, such an option would not in any event have been open to us. For the reasons explained in the text, and to state matters simply, the government cannot counter a defendant's Rule 33 motion with new evidence of its own. For purposes of determining whether the evidence against a defendant renders his or her newly acquired exculpatory information immaterial, a court must focus on the inculpatory evidence actually introduced at trial. It may not speculate as to what additional matter the government might have presented but did not, or might yet present in a future hypothetical proceeding.

■ "Courts are particularly reluctant to grant [Rule 33] motions where the newly discovered evidence consists of a witness recantation as such recantations are 'looked upon with the utmost suspicion.'" *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987) (citations omitted). With this proposition in mind, the recanted recantation now before us can only be viewed with extreme skepticism. Nevertheless, assuming that Brown effectively recanted his trial testimony, the jury's verdicts were amply supported by other evidence such that we cannot conclude that "'defendant[s] would most likely not have been convicted'" absent the allegedly tainted testimony.[4] *Wallach,* 935 F.2d at 456 (quoting *Sanders,* 863 F.2d at 226). First, Brown provided virtually no testimony against Alfredo Gallego, saying only that he met Gallego at a New Year's Eve party with Martinez and saw Gallego again on television following the murder. Second, Brown's testimony concerning Martinez, his long-time friend, was hardly significant to the government's case. In many respects, it hindered the prosecution. As discussed, Brown did testify that Martinez described a plot to rob a postal truck, but he also testified that Martinez declared his innocence to him in a private conversation following the robbery and murder. Moreover, as discussed in Section I(B), *supra,* the government presented overwhelming evidence at trial, independent of Brown's testimony, demonstrating Martinez's participation in the plot to rob and kill Gonzalez. Accordingly, we affirm the district court's decision rejecting defendants' motion for a new trial on the basis of Brown's recantation.

### D. The Corrected Transcript

■ Defendants' remaining "new evidence" in support of their Rule 33 motion is a corrected transcript of a recording Rosado made of a phone conversation with Brown in October 1994. The government transcript, which was introduced into evidence at trial, included a sentence (absent from the corrected transcript) in which Brown indicated that Martinez was "not going to drive," presumably suggesting (indirectly) that Martinez needed to enlist at least one accomplice in his plot to rob and kill Gonzalez. According to defendants, Brown never uttered these words. Assuming *arguendo* that this redaction even qualifies as "new evidence," we agree with the district court that there is no basis to conclude that eliminating this single sentence would have led to an acquittal in this case. As highlighted throughout the preceding sections of this opinion, there was overwhelming evidence against each defendant independent of any of the allegedly tainted information.

### II. Hearsay Objections

Defendants argue that the district court erroneously admitted two out-of-court statements by George Gallego in violation of Rule 802 of the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment. In particular, defendants challenge the admission of (1) a portion of George Gallego's plea allocution, in which he admitted to participating in a conspiracy to rob and possibly murder Gonzalez and (2) Cintron's testimony recounting his phone conversation with George Gallego shortly after Gonzalez's murder.

### A. George Gallego's Plea Allocution

■ "In all criminal prosecutions ... the accused has a right, guaranteed by the

---

4. Martinez argues that the district court should have convened an evidentiary hearing to determine whether the government knew that Brown's trial testimony was false. This knowledge, if it existed, would have triggered the relaxed standard requiring reversal of a conviction if there is "any reasonable likelihood" that the false testimony "could have affected the judgment." *Wallach,* 935 F.2d at 456 (quoting *Perkins,* 691 F.2d at 619). Even if this were the applicable standard, however, our holding would not change. As explained in the text, Brown was not a key government witness and defendants' convictions are supported by overwhelming evidence independent of his testimony.

Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him.'" *Lilly v. Virginia,* —— U.S. ——, ——, 119 S.Ct. 1887, 1893, 144 L.Ed.2d 117 (1999) (quoting U.S. Const. amend. VI). This right, however, which ordinarily assures defendants an opportunity to cross-examine the witnesses against them, is not unqualified. In particular, when a declarant is unavailable to testify at trial, his or her "hearsay statement[ ] is sufficiently dependable to allow [its] untested admission ... against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Id.* at ——, 119 S.Ct. at 1894 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

In support of its decision to admit a portion of George Gallego's plea allocution into evidence, the district court found that George Gallego was unavailable and characterized his allocution as a statement against penal interest, admissible under Rule 804(b)(3) of the Federal Rules of Evidence. *See Gallego,* 913 F.Supp. at 213. While acknowledging that this Court has yet to determine whether this rule qualifies as a "firmly rooted hearsay exception" for Confrontation Clause purposes, the district court concluded that under the circumstances of this case, George Gallego's plea allocution possessed "particularized guarantees of trustworthiness," rendering it "sufficiently trustworthy" to justify its admission at trial. *Id.*

(internal quotations omitted). The court emphasized that "George Gallego's plea undeniably subjected him to the risk of a lengthy term of imprisonment," even if it was also made in the hope of obtaining a more lenient sentence; that "the allocution was given under oath"; and that the allocution was corroborated by Alfredo Gallego's "previous plea of guilty to charges of robbery and conspiracy to commit robbery with respect to the same incident...." *Id.* Finally, the district court instructed the jurors that they could consider Gallego's allocution only as evidence that a conspiracy existed and not as direct evidence that defendants were "member[s] of that alleged conspiracy" or that they were otherwise guilty of the crimes charged against them. (Tr. 1620.)

■■■■■ As an initial matter, we agree with the district court that George Gallego's plea allocution qualifies as a statement against penal interest for purposes of Rule 804(b)(3). *See United States v. Scopo,* 861 F.2d 339, 348 (2d Cir.1988) ("In general a plea of guilty is a statement against the penal interest of the pleader for the obvious reason that it exposes him to criminal liability."); *United States v. Winley,* 638 F.2d 560, 562 (2d Cir.1981) ("It is hard to conceive of any admission more incriminating to the maker or surrounded by more safeguards of trustworthiness than a plea of guilty in a federal court, particularly when, as here, the facts elicited in the allocution are buttressed by the testimony of other witnesses."). As in the past, however, we decline to resolve whether this rule qualifies as a "firmly rooted hearsay exception."[5] *See, e.g., Latine v. Mann,* 25

---

5. The Supreme Court's recent plurality decision in *Lilly,* which was issued after oral argument in this matter, does not foreclose the possibility that Rule 804(b)(3) qualifies as such an exception. In *Lilly,* the Virginia Supreme Court upheld a state trial court decision admitting, in their entirety, several tape recordings and written transcripts of a series of statements by the defendant's brother during a police interrogation in which he admitted being present throughout a violent crime spree but insisted that he was drunk at the time and that the defendant was primarily responsible for the assorted crimes and violence. *Lilly,* —— U.S. at —— – ——, 119 S.Ct. at 1892–93. The Supreme Court reversed, with a four justice plurality concluding that because this accomplice confession was largely "non-self inculpatory" (*i.e.,* the declarant minimized his own criminal responsibility and shifted blame to the defendant), it was presumptively unreliable and could not be admitted "within a firmly rooted hearsay exception...." *Id.* at —— – ——, 119 S.Ct. at

F.3d 1162, 1166 (2d Cir.1994) ("There is no need to resolve the issue here, however, as [the declarant's] statement also bears adequate indicia of reliability and is thus admissible under the totality of the circumstances."). Instead, we affirm the decision below because we agree with the district court that George Gallego's allocution possessed sufficient guarantees of trustworthiness to justify its admission into evidence.

■■■ While a court cannot look to "other evidence at trial [to] corroborat[e] portions of [the declarant's] statements," we are satisfied that the district court here relied principally upon aspects of the allocution rendering it "inherently trustworthy." *Lilly*, ── U.S. at ──, 119 S.Ct. at 1900. Indeed, the only outside corroboration that the district court even alluded to was Alfredo Gallego's own guilty plea on his initial robbery indictment, and this outside corroboration was hardly at the heart of the trial court's decision. Rather, the court focused on the fact that George Gallego faced a significant and imminent prison sentence as a direct result of his allocution, and that he delivered the allocution under oath and before a judge. Moreover, the district court admitted only self-inculpatory portions of the allocution, which are particularly trustworthy, and limited the impact of those excerpts by instructing the jury to consider George Gallego's allocution only as evidence of a conspiracy. *See Williamson v. United States*, 512 U.S. 594, 605, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("[T]he very fact that a statement is genuinely self-inculpatory ... is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible

under the Confrontation Clause."); *United States v. Williams*, 927 F.2d 95, 98 (2d Cir.1991) (approving district court's limiting instruction that a co-defendant's allocution could be considered only as evidence of a conspiracy and not as evidence of the defendant's guilt as a member of that conspiracy); *Winley*, 638 F.2d at 561 ("Judge Weinfeld properly sought to caution the jury not to infer appellant's guilt directly from that fact that his co-defendants had pled guilty."). These safeguards, coupled with the inherently trustworthy aspects of the allocution, rendered that allocution sufficiently reliable to warrant its admission into evidence.

■■■ Even were we to conclude that the district court erred by admitting George Gallego's plea allocution into evidence, the record before us makes clear that any such error would have been harmless. *See Williams*, 927 F.2d at 99 ("It is clear beyond cavil that the doctrine of harmless error is applicable in cases involving the confrontation clause of the Sixth Amendment."); *Delaware v. Van Arsdall*, 475 U.S. 673, 680–84, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that if hearsay statements are erroneously admitted into evidence in violation of the Confrontation Clause, defendants' convictions should not be disturbed on appeal if such error was harmless beyond a reasonable doubt). In the portion of his allocution admitted into evidence, George Gallego admitted that he was involved in a conspiracy to rob Gonzalez's postal truck and that he "underst[ood] that [Gonzalez] would be killed if it was necessary to facilitate the robbery." As discussed above, *see* § I(B), *supra*, there

---

1897–98. In contrast to the state law hearsay exception at issue in *Lilly*, Rule 804(b)(3) itself prohibits the admission of such "non-self inculpatory" statements. *See Williamson v. United States*, 512 U.S. 594, 600–01, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("[T]he most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."). Here, for instance, the district

court complied with Rule 804(b)(3) by admitting only a small portion of George Gallego's allocution in which he named none of his coconspirators and unqualifiedly confessed his own guilt. This evidence—in fact, any hearsay statement admitted consistent with the requirements of Rule 804(b)(3)—is considerably more reliable than the largely "non-self inculpatory" declaration disapproved by the plurality in *Lilly*.

was overwhelming evidence at trial, in addition to George Gallego's plea allocution, establishing both of these facts, *i.e.,* the existence of a conspiracy to rob Gonzalez and an understanding among the conspirators that Gonzalez might be killed during the course of the robbery.

### B. Cintron's Testimony

Defendants also object on hearsay grounds to Cintron's testimony at trial describing statements allegedly made by George Gallego during a phone conversation on the night of Gonzalez's murder. The government concedes that Cintron's testimony was false, and makes no argument defending the district court's decision to admit the testimony at trial. Rather, the government contends that defendants would have been convicted even had Cintron never testified. We agree.[6]

■■■ As discussed in Section I(B), *supra,* the government presented extensive evidence, including eyewitness accounts, phone records and forensic evidence, confirming all key aspects of Cintron's testimony and providing ample independent basis for defendants' convictions. Moreover, Alfredo Gallego himself relied on Cintron's allegedly perjured testimony to support his claim that Gonzalez was killed only because he resisted the robbery of his postal truck. Accordingly, as with the district court's admission of George Gallego's plea allocution, any error in admitting Cintron's perjured testimony was harmless as a matter of law.

### III. Double Jeopardy

■■■ Alfredo Gallego pled guilty to the original indictment charging him with conspiracy to rob and assault a postal employee in violation of 18 U.S.C. § 2114. The government obtained an upward departure from the robbery guideline range based on Gonzalez's death, *see* U.S.S.G. § 5K2.1, and Gallego was sentenced to a prison term of 17½ years. Gallego claims, and argued before the district court, that his subsequent prosecution and conviction for conspiracy to commit murder and murder was thereby barred by the Double Jeopardy Clause of the Constitution.

### A. The Sentence Enhancement

■■■ We reject Gallego's Double Jeopardy argument based on his sentence enhancement for substantially the same reasons stated by the district court in its December 11, 1995 decision. *See Gallego,* 907 F.Supp. at 737–39. As Judge Kaplan explained, the Supreme Court recently clarified "that consideration of relevant conduct in determining a defendant's sentence does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause." *Id.* at 736 (citing *Witte v. United States,* 515 U.S. 389, 406, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995)). In our view, moreover, the reasoning in *Witte* applies not only to mandatory "relevant conduct" sentence enhancements, but also to discretionary enhancements generally. *See Witte,* 515 U.S. at 402, 115 S.Ct. 2199 ("Regardless of whether particular conduct is taken into account [at sentencing] by rule or as an act of discretion, the defendant is still being punished only for the offense of conviction."). Thus, the government was

---

6. Because the government does not take a position on the issue, and because it is unnecessary to our resolution of this appeal, we reach no conclusion as to whether the district court erred by admitting Cintron's hearsay testimony at trial. We do note, however, that this Court recently rejected the "suggestion that a criminal confidence to a friend, admitting guilt and naming an accomplice without seeking to diminish the declarant's responsibility, is *per se* so inherently trustworthy as

evidence of the guilt of the named accomplice that it satisfies the Confrontation Clause." *Mingo v. Artuz,* 174 F.3d 73, 77 (2d Cir.1999). Faced with these circumstances, "[a] court must carefully examine each instance of incriminating hearsay in the light of all the circumstances, taking care to consider all reasonable motivations of the declarant to lie, before concluding that such evidence is so reliable that the defendant had no constitutional right of confrontation." *Id.*

not constitutionally prohibited from prosecuting Gallego for murder merely because that same crime was reflected in an upward departure in the sentence he received in connection with his robbery conviction. *See id.; see also United States v. Grisanti,* 116 F.3d 984, 985 (2d Cir.1997) (holding that the Double Jeopardy Clause does not prevent "the government from prosecuting a defendant for obstruction of justice where the same conduct was previously used to enhance the defendant's sentence for a separate criminal offense").

**B. The District Court's Conditional Conspiracy and *Pinkerton* Charges**

■ At the close of the trial, the district court instructed the jury that it could find defendants guilty of a conspiracy to murder if "the alleged conspirators agreed that [Gonzalez] would be killed if that proved to be necessary, and if ... [the alleged conspirators] believed that there was reasonable likelihood that the necessity of killing [Gonzalez] would come about...." The district court further instructed the jurors, pursuant to *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946),[7] that the defendants who did not actually kill Gonzales could nevertheless be found guilty of first degree murder on the following theory:

If you have found a defendant guilty of conspiracy to murder, then you may, although you are not required to, find that the defendant is guilty of murder in the first degree if you find that the following elements have been proved beyond a reasonable doubt:

First, that the postal driver, Mr. Gonzalez, was murdered in the first degree;

Second, that the person or persons whom you find actually committed the crime of murder in the first degree were

members of the conspiracy to commit murder;

Third, that the murder was committed pursuant to the common plan and understanding that you found to exist among the conspirators;

Fourth, that the defendant in question was a member of the conspiracy at the time the murder was committed;

And, finally, that the defendant in question reasonably could have foreseen that the murder might be committed by his co-conspirators.

Alfredo Gallego argues that these instructions violated the Double Jeopardy Clause because the charges encompassed all of the elements of his prior robbery conviction. In this respect, Gallego argues, both instructions are essentially identical to the felony murder count that the district court properly dismissed before trial. *See Gallego,* 907 F.Supp. at 738–39 ("felony murder is not a separate and distinct offense from the various elements of the underlying felony or felonies").

■ The linchpin of Double Jeopardy analysis is whether each statutory provision charged "requires proof of a different element." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). "If there is an element in each offense that is not contained in the other, they are not the same offense for purposes of double jeopardy, and they can both be prosecuted." *United States v. Chacko,* 169 F.3d 140, 146 (2d Cir.1999) (citing *United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)). In its conspiracy to murder charge, the district court instructed the jury that it could find defendants guilty only if it concluded that defendants had agreed to kill Gonzalez if necessary to complete their robbery, and if defendants further understood that it was reasonably likely that this contingency

---

**7.** *Pinkerton* "permits a jury to find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." *United States v. Miley,* 513 F.2d 1191, 1208 (2d Cir.1975) (Friendly, J.).

would come to pass. Gallego argues that this instruction violated the Double Jeopardy Clause by incorporating all of the elements of robbery into the charged conspiracy to murder, essentially rendering robbery "a species of lesser-included offense." *Illinois v. Vitale*, 447 U.S. 410, 420–21, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980) ("[A] conviction on a lesser-included offense bars subsequent trial on the greater offense."). This represents a strained reading of the court's instruction, however, as the judge never told the jury that it needed to find defendants guilty of robbery in order to find them guilty of a conspiracy to murder. Rather, the district court simply identified intent to murder as a necessary element for conviction, while instructing jurors that this intent could have been conditional, hinging on the way in which events unfolded during the robbery. *Cf. Holloway v. United States*, 526 U.S. 1, ——–——, 119 S.Ct. 966, 971–72, 143 L.Ed.2d 1 (1999) (" '[a]n intent to kill, in the alternative, is nevertheless an intent to kill.' ") (quoting R. Perkins & R. Boyce, Criminal Law 647 (3d ed.1982)). In this way, defendants' conditional intent may have, as a factual matter, related to the robbery, but the robbery, as a legal matter, was not a necessary element of the conspiracy to commit murder charge.

 As for the court's *Pinkerton* charge, the district court was clear that the jurors could only convict upon finding, among other things, a conspiracy to murder. As explained, a conspiracy to murder requires a shared intent to kill (even if only conditionally), which of course is not an element of robbery. Likewise, for the reasons discussed, robbery was not an element of the court's murder charge, *i.e.*, the jury was not instructed that in order to find defendants guilty of murder, it had to conclude that defendants had committed robbery. The jury was merely instructed that in finding an intent to kill, an intent conditioned on certain circumstances related to the robbery would suffice. Thus, the court's murder charge included an element

that was not a part of Gallego's prior robbery conviction, and the elements of Gallego's robbery conviction were not incorporated into the court's subsequent murder charge. As with the Court's conspiracy to murder charge, its *Pinkerton* charge did not run afoul of the Double Jeopardy Clause.

## IV. Martinez's Absence During Juror Questioning

 Martinez claims that he was deprived of his right to be present during all stages of his trial because he was absent during the individual *voir dire* of certain prospective jurors concerning their possible biases. *See* Fed.R.Crim.P. 43(a) (requiring the presence of a criminal defendant, as a general rule, "at every stage of the trial including the impaneling of the jury"). Although a defendant is generally entitled to be present throughout trial, with this entitlement extending to the jury's impanelment, it is "well established that a defendant may waive his right to be present at any time during trial if his waiver is knowing and voluntary." *United States v. Rosario*, 111 F.3d 293, 299 (2d Cir.1997). Such a waiver may, moreover, be implied by a defendant's conduct. *See, e.g., Tankleff v. Senkowski*, 135 F.3d 235, 246–47 (2d Cir.1998). In *Tankleff*, for instance, neither the defendant nor his attorney raised any objection to the defendant's absence during a segment of *voir dire* in which the trial court questioned prospective jurors about possible prejudice resulting from their exposure to pre-trial publicity relating to the defendant's alleged crimes. *See id.* Significantly, the trial judge "discussed the process in open court several times while [the defendant] was present," which made it "reasonable to conclude that [the defendant] knew what was going on." *Id.* at 247. Under these circumstances, the Court held that the defendant's failure to object amounted to a waiver. *See id.*

In this case, the trial judge began jury selection by asking a number of questions

in open court, with Martinez present, both to the entire panel and to fifty selected panel members. In response to these questions, a number of prospective jurors expressed reservations as to their ability to serve impartially. Still in open court, the judge then announced his intention "to take counsel into the robing room" to "meet individually with those [prospective jurors] who ha[d] expressed the view that it would be difficult for [them] to serve." Martinez did not object to the court's proposal and did not request to participate. Subsequently, in the robing room, and without Martinez present, Judge Kaplan explained to counsel that he planned to "hear challenges for cause first, then . . . the hardships." The court then questioned the individual jurors about their possible biases, and counsel on both sides raised a number of challenges for cause.[8] Because neither Martinez nor his counsel objected at any point in this process, we conclude that Martinez waived his right to participate and that he therefore was not unconstitutionally deprived of the opportunity to be present during all stages of his trial. *See United States v. Gagnon*, 470 U.S. 522, 529, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam) ("We hold that failure by a criminal defendant to invoke his right to be present . . . at a conference which he knows is taking place between the judge and a juror in chambers constitutes a valid waiver of that right."); *Tankleff*, 135 F.3d at 247 ("[W]e think waiver may properly be inferred from the conduct of the defendant and his attorneys.").

In arriving at this holding, we reject Martinez's suggestion that this case can be distinguished from *Tankleff* on the basis that here the district court's "explanation of what it intended to do was ambiguous, such that one might infer that all that was

to be discussed were questions of practical hardship and not the more fundamental issues of whether the prospective jurors could be impartial." (Martinez Br. at 58.) Seizing on this supposed ambiguity, Martinez claims that he could not have knowingly waived his right to be present during juror questioning because he did not actually know, and was never specifically informed, that this questioning would reach matters of possible bias and prejudice. Martinez's position, however, is belied by the record below. As noted earlier, before beginning the first round of individual questioning, the trial judge announced in open court that he would question those jurors who had "expressed the view" that it would be "difficult" for them to serve. This comment was directed to those prospective jurors who had earlier expressed reservations in open court about their ability to serve impartially. In his reply brief, Martinez identifies a prospective juror who, for instance, had indicated in open court that she was simply not certain whether she could be fair. (*See* Reply at 6.) Similarly, another prospective juror had indicated in open court that she lived with a police officer and was not certain whether this would affect her "ability to be impartial." Predictably, in each instance, the judge asked these prospective jurors, once they had been taken to the jury room, about the concerns they voiced in court. Events thus unfolded in the robing room exactly as one would expect from having been present—as Martinez was—during the earlier proceedings in open court. We therefore refuse to credit Martinez's claim that he did not "knowingly" waive his right to be present while the court questioned prospective jurors as to their possible biases.[9]

---

**8.** Judge Kaplan then returned to open court to excuse a number of prospective jurors and repeated the process a second time. He once again directed a number of general questions to a group of fifty panel members and then returned to his robing room with counsel to interview those members who voiced concerns about their ability to serve. After this

round of individual questioning, and with Martinez present, the prosecution and defense announced their peremptory challenges and the jury was impaneled.

**9.** Even if we were to accept Martinez's dubious contention that he did not initially understand the scope of the proceedings in the

## V. *Singleton*

■ Finally, Martinez invokes the Tenth Circuit's panel decision in *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), which held that government cooperation agreements violate the federal anti-gratuity statute, 18 U.S.C. § 201(c)(2), and argues that his conviction must be reversed because several cooperating witnesses testified against him. We reject this argument on the basis of our recent decision in *United States v. Stephenson*, 183 F.3d 110, 118 (2d Cir.1999), in which we rejected an identical claim and adopted the reasoning in the Tenth Circuit's *en banc* reversal of its initial *Singleton* decision, 165 F.3d 1297 (10th Cir.1999).

## CONCLUSION

We have considered appellants' other arguments and find them to be without merit. For the reasons stated above, we affirm the district court's judgment in all respects.

robing room, his attorney "remained present and was active throughout the entire questioning." *Rosario*, 111 F.3d at 299 (holding that "[d]ue process does not assure 'the privilege of presence when presence would be useless, or the benefit but a shadow.' ") (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106–07, 54 S.Ct. 330, 78 L.Ed. 674 (1934)). We presume under these circumstances, which included two separate rounds of questioning with a break in between, that Martinez had an adequate opportunity to learn the full extent of the court's questioning, certainly before the jury was sworn. Nevertheless, Martinez raised no objection at any point, leaving the district court with no opportunity to address or "accommodate a meritorious claim in whole or in part." *Gagnon*, 470 U.S. at 529, 105 S.Ct. 1482. This underscores that Martinez was not genuinely concerned about his initial absence from the robing room and that he did knowingly waive his right to be present.