**UNITED STATES of America**

v.

**Seynabou SECK, a/k/a "Seck Seynabou," a/k/a "Seck Daba," a/k/a "Daba Seck," a/k/a "Ndeye Seck," a/k/a "Ndeye Seck Fallow," Defendant.**

**No. S2 99 CR 808 RCC.**

United States District Court, S.D. New York.

May 1, 2001.

Eric Bruce, Assistant United States Attorney, Mary Jo White, United States Attorney, New York City, for Plaintiff.

Roland Thau, New York City, Marc E. Leibman, Willis & Young, Jersey City, NJ, for defendant.

## OPINION AND ORDER

CASEY, District Judge.

Defendant Seynabou Seck ("Seck") moves to vacate her conviction on three counts of credit card fraud and seeks a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based upon newly discovered evidence that a co-

operating government witness, Mr. Mamadou Diallo ("Diallo"), perjured himself at trial. For the reasons set forth below, defendant's motion is denied.

## I. BACKGROUND

Seck was found guilty, after a jury trial, of conspiracy to commit access devices fraud (18 U.S.C. § 1029(b)(2)), unlawfully trafficking in or using unauthorized access devices (18 U.S.C. § 1029(a)(2)) and unlawfully possessing 15 or more unauthorized access devices (18 U.S.C. § 1029(a)(3)). The government elicited evidence at trial that Seck maintained a number of telephone lines in her apartment and that calls had been made on those lines to recharge prepaid calling cards with stolen credit card numbers. The government also introduced prepaid calling cards and papers containing stolen credit card numbers that were seized from Seck's apartment, some bearing Seck's fingerprints. Seck disclaimed any involvement in the fraudulent scheme, and testified that the calling cards and credit card numbers belonged to her former roommate, "Babacar."

Seck's testimony was called into question by, among other things, the testimony of Diallo, a cooperating government witness. Diallo testified, *inter alia,* that Seck discussed the recharging of calling cards with him and sought an introduction to his credit card number supplier. Diallo further testified that Seck brought a suitcase containing credit card receipts and prepaid calling cards to his apartment for safekeeping, stating that she feared investigation by the police. Seck's fingerprints were found on some of the papers recovered from Diallo's home.

During his direct testimony, Diallo also stated that he could not read or write in any language. Transcript ("Tr.") at 631. On cross-examination, defense counsel elicited that, notwithstanding his illiteracy, Diallo had passed a written test in order to obtain his New York State driver's license. Diallo attributed his success to help from Allah:

Q. Did you take a written test to get a driver's license?

A. Yes, I did that in French.

Q. You speak and write French, right?

A. I cannot write, but I just took the test and Allah helped me to pass the test.

Q. Allah helped you pass the test?

A. Yes, it's my luck that just allowed me to pass the test.

Tr. at 740; *see also id.* at 741.

After the trial ended, the government met with Diallo regarding his testimony. *See* Affirmation of Assistant United States Attorney Eric B. Bruce dated January 11, 2001 ("Bruce Aff."), at ¶ 7. During that meeting, the government questioned Diallo for the first time about the manner in which he obtained his driver's license. *Id.* Diallo revealed that he had paid someone fifty dollars to help him cheat on the written test by sitting next to him and pointing out the correct answers. *Id.; see also* Letter from Bruce to Thau dated December 13, 2000, at 1. Approximately five months after the conclusion of the trial, the government notified defense counsel and the Court of Diallo's perjury. On the basis of this new information, Seck now moves to vacate the verdict and for a new trial pursuant to Fed.R.Crim.P. 33.[1]

---

1. Seck also requests an evidentiary hearing "which would elicit whether the trial witness Mamadou Diallo gave perjured testimony the government knew then or should have known was untruthful." Def. Mem. at 1. However,

the government concedes that Diallo testified falsely and has informed defense counsel of the true facts. Moreover, government counsel has affirmed under penalties of perjury that he did not learn of the falsity of Diallo's

## II. DISCUSSION

■ Federal Rule of Criminal Procedure 33 provides that a district court may grant a new trial "if the interests of justice so require." Fed.R.Crim.P. 33. Because Rule 33 motions are "not favored" in this Circuit, district courts should exercise "great caution" and grant the motion "only in the most extraordinary circumstances." *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir.1993) (citations omitted); *see also United States v. Gordils*, 982 F.2d 64, 72 (2d Cir.1992) (holding that Rule 33 motions are reserved for extraordinary circumstances such as where the evidence "would probably lead to acquittal"), *cert. denied*, 507 U.S. 1054, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993). The defendant bears the burden of demonstrating that a new trial is warranted. *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995).

■ Ordinarily, with respect to motions based on newly discovered evidence, the defendant is not entitled to relief unless (1) the newly discovered evidence could not have been discovered with due diligence before or during trial; and (2) the evidence is so material and non-cumulative that its admission would probably lead to an acquittal. *United States v. Gallego*, 191 F.3d 156, 161 (2d Cir.1999) (citations omitted), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000); *see also United States v. White*, 972 F.2d 16, 20–21 (2d Cir.), *cert. denied*, 506 U.S. 1026, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992).

■ However, where the defendant presents evidence of perjury by a government witness, a more favorable standard may apply "depending on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *Gallego*, 191 F.3d at 162

(quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991)); *see also United States v. Wong*, 78 F.3d 73, 81 (2d Cir.1996). If the prosecution knew or should have known of the perjury, the Second Circuit's decision in *Wallach* mandates a new trial if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Wong*, 78 F.3d at 81 (citations omitted). On the other hand, if the government was unaware of the perjury at the time of trial, the court must have "a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id.*

### A. Diallo's Testimony Regarding the Driver's Test

■ Seck contends that the government knew or should have known of the true facts about the driver's test, thus necessitating a new trial under *Wallach*. However, government counsel has attested that the government did not question Diallo about his driver's license prior to trial, and only learned of the cheating scheme some time after. Bruce Aff. at ¶¶ 5–7. The Court has no basis to doubt the veracity of these statements. Nor can the Court conclude that the government should have known of the circumstances surrounding the driver's examination, particularly as the issue of Diallo's driver's license was a collateral matter wholly unrelated to the case against Seck. Indeed, the issue was raised at trial for the first time by defense counsel on cross-examination. "Where the challenged false testimony was elicited by the defense, rather than the prosecution, that circumstance tends to establish the government's unawareness of the perjury." *United States v. Damblu*,

statements until after the conclusion of the trial. Bruce Aff. at ¶ 7. Thus, there are no

issues of fact which warrant an evidentiary hearing on this motion.

134 F.3d 490, 493 (2d Cir.1998) (citing *Wong*, 78 F.3d at 81–82).

■ Moreover, even assuming that the government did know, *Wallach* does not mandate a new trial because here Diallo was not the "centerpiece" of the prosecution. *Wallach*, 935 F.2d at 457. In *Wallach*, although the perjury at issue concerned only a collateral credibility issue, the Second Circuit nonetheless required a new trial because the witness was "critical" to the government. *Id.* at 455; *see also Wong*, 78 F.3d at 82 (holding that "new impeachment evidence may satisfy the 'reasonable likelihood' standard where a conviction depends on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross examination").

Here, the government introduced many other items of evidence which, even independent of Diallo's testimony against Seck, were sufficient to support a conviction. For example, the government established that 15 different phone lines had been installed in Seck's apartment within a span of 13 months, and over 4,500 recharges of calling cards were made over a number of those phone lines. The superintendent of Seck's building testified that Seck offered him $100 to install an additional phone line. Seck's fingerprints were found on papers and notebooks containing stolen credit card numbers that were recovered from both Diallo's home and Seck's apartment. Indeed, the configuration of the fingerprints on one of those papers demonstrates that Seck handled that document on numerous occasions. Given this substantial independent evidence supporting the conviction, Seck is not entitled to a new trial. *See Wong*, 78 F.3d at 82 ("[W]here independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial.")

Moreover, unlike in *Wallach*, here the witness's credibility repeatedly was called into question at trial. First, with respect to driver's test itself, defense counsel competently brought out on cross-examination that Diallo's statement of illiteracy was inconsistent with his ability to pass a written examination. *See* Tr. at 740–41. Defense counsel then proceeded to reiterate this point in closing arguments:

Mr. Diallo, you had a driver's license? Yes. You take a writing test? Well, I had a license in Africa. Did you have a license from the State of New York? Yes. Did you take a written test? Yes, in French. In French? So you know how to read and write in French? No. Did you take a writing test in English? Allah helped me.

That's what the man testified to you under oath. This man commits out and out perjury and he compounds his villainy by invoking the name of his deity. It is extraordinary, I suggest to you. It is despicable. It is shameful.

Tr. at 1212–13. Thus, even without absolute knowledge that Diallo cheated on the test, defense counsel certainly suggested to the jury that Diallo's explanation was suspect. *See United States v. Ward*, 190 F.3d 483, 491 (6th Cir.1999) ("We think *Wallach* does not apply here, because in that case the perjured testimony was not brought to the attention of the jury, whereas here, the court gave the defendants several opportunities to cross-examine and recross-examine the witnesses to bring any inconsistencies in testimony to the attention of the jury."), *cert. denied*, 528 U.S. 1118, 120 S.Ct. 940, 145 L.Ed.2d 817 (2000).

Defense counsel also elicited testimony, both on cross-examination and during closing arguments, that Diallo recently was

convicted of a felony and was cooperating with the government in order to reduce his own jail time. *See* Tr. at 742–48, 1207–08. Diallo similarly acknowledged on direct that he been arrested for credit card fraud, and had been arrested "about six or seven times" for selling counterfeit goods. *Id.* at 631–37. Diallo also confessed that he lied to agents and prosecutors during the government's investigation. *See id.* at 647. Thus the jury had ample reasons to question Diallo's credibility. *See Wong*, 78 F.3d at 82 (holding that a new trial was not required because the evidence of perjury was "the sort of cumulative impeachment material that is routinely held insufficient") (citations omitted); *White*, 972 F.2d at 21 (denying new trial where the evidence of perjury "would have been admissible only for the purpose of showing that [the witness] lied about his drug use, a collateral fact that would simply affect the general credibility of [the witness] and was not evidence that he was lying as to a particular fact about the crime," and "was cumulative of other evidence of collateral matters that focused on his credibility").

Furthermore, unlike in *Wallach*, the government did not make any attempt to rehabilitate Diallo after defense counsel's cross-examination. *See Wallach*, 935 F.2d at 457 (noting disapprovingly that "instead of proceeding with great caution, the government set out on its redirect examination to rehabilitate [the witness] and elicited his rather dubious explanation of what had happened"). Nor did the government personally vouch for Diallo's credibility in its closing; in fact, the government acknowledged that Diallo was a "criminal" and cautioned the jury to look to corroborating evidence. Tr. at 1165. Indeed, the Court itself instructed the jury that "[b]ecause of the possible interest a cooperating witness may have in testifying, the witness' testimony should be scrutinized with special care and caution." Tr. at 1252.

Therefore, a new trial is not appropriate because the Court does not have a firm belief that but for Diallo's perjury,. Seck likely would have been acquitted. Indeed, even if the Court were to presume government knowledge of the perjury, *Wallach* does not mandate a new trial in these circumstances because there is no reasonable likelihood that Diallo's perjury affected the judgment of the jury. *See Wong*, 78 F.3d at 82.

### B. Diallo's Testimony That He Could Not Read Numbers

■ Seck also appears to suggest that Diallo further perjured himself when he testified that he could not read numbers. *See* Affirmation of Roland Thau dated December 22, 2000, at ¶ 7. Although this testimony at first blush may seem inconsistent with Diallo's ability to recharge calling cards, it does not constitute perjury. Rather, the testimony reflects Diallo's own perception of his competence with numbers. *See James v. Illinois*, 493 U.S. 307, 314 n. 4, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990) (noting that false testimony may result from an honest, even if erroneous, perception rather than from intentional perjury). For example, although Diallo can recognize low numbers, he is not able to identify larger numbers. *See* Bruce Aff. at ¶ 10. Thus, when the government wrote the number "1,624" for Diallo, he identified the number as "one, six, two, four." *Id.* Diallo attributed his answer to his inability to "read" numbers. *Id.*

At trial, Diallo explained how he was able to recharge calling cards:

Q. Can you read numbers?

A. No, I cannot read numbers.

Q. How is it that you are recharging calling cards if you can't read numbers?

A. Charging credit cards -

Q. Phone cards?

A. does not require, doesn't require knowing how to read because it just tells you the instructions on how, what to do.

Q. And does it tell you to punch in certain numbers?

A. Yes, the numbers that it tells to you put like if it tells you to put the number 3 or it tells you to put the number 2, the numbers are there in front of you. You looking at them.

Q. But it doesn't do any good to look at something you can't read, right?

A. Credit card numbers it's not something that you have to read because it's not necessary to read that.

Tr. at 736; *see also id.* at 737–40. Diallo thus acknowledged that he was able to— and did—fraudulently recharge calling cards despite his inability to "read" numbers. Therefore, the jury was never in any doubt as to the extent of Diallo's abilities. A new trial is not warranted in these circumstances.

III. CONCLUSION

For the foregoing reasons, defendant's motion to vacate her conviction and for a new trial is hereby DENIED.